**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARILYN FARMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  13 C 8224 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Judge Jorge L. Alonso |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Marilyn Farmer, brings this lawsuit for premises liability and negligence against the United States Postal Service ("USPS"), seeking to recover damages for injuries she sustained in a fall that occurred at the United States Post Office in Plainfield, Illinois.[1]

On September 25, 2015, the Court entered a final pretrial order containing the parties' stipulations and list of joint exhibits.  The case proceeded to a three-day bench trial on October 5, 6, and 7, 2015, at which the Court heard the parties' opening and closing arguments and testimony from Farmer and several other witnesses and admitted a number of exhibits into evidence.  The parties also submitted proposed findings of fact and conclusions of law.

The Court has considered the evidence, including the parties' stipulations and submissions, and the testimony and exhibits presented at trial.  At trial, the Court was able to observe the witnesses and evaluate their credibility, and decide what weight to give to each witness's testimony. On the basis of the findings of fact and conclusions of law set forth below pursuant to Federal Rule

---

[1]Plaintiff seeks damages in the amount of $163,660.15 for medical expenses; $210,000 for past pain and suffering; $149,100 for future pain and suffering; $273,000 for past loss of a normal life; and $175,000 for future loss of a normal life, for a total of $970,760.15.  At trial, plaintiff withdrew her request for damages for lost wages.

of Civil Procedure 52, the Court will enter judgment for the defendant, the United States.

## FINDINGS OF FACT

**Plaintiff's Fall**

This case arises from a fall that occurred on December 20, 2011 at the United States Post Office at 14855 South Van Dyke Road in Plainfield, Illinois (the "post office"). Plaintiff, Marilyn Farmer, lives in Plainfield and was 64 years old at the time of the incident. Farmer, who visited the post office a number of times per week to check her post-office box, went there that day to mail a package. She was wearing a zipped jacket; jeans; socks; and flat clog-type shoes with a mostly open back, a cork footbed, and a rubber sole. (Joint Ex. 1, Photographs.) Farmer brought her package and purse into the post office in a rolling cart that she pulled with her right hand. The cart consisted of a two-wheeled hard plastic crate with a telescoping handle. Farmer was moving with no problems and did not require any physical assistance. She was not rushing or running late for anything.

Farmer entered the post office and then joined the line of people waiting to approach the service counter. The post office had, and still has, a tiled floor. The area designated for the line was marked by a commercial floor mat consisting of a carpeted runner with rubber edges (the "floor runner"), about three feet wide and ten feet long, located near the "supply island," a long, freestanding counter where customers could fill out forms and prepare their shipments. Next to the end of the supply island and at the front of the line was a stanchion with a sign on top that read "PLEASE WAIT FOR NEXT AVAILABLE AGENT." On the floor near the stanchion and about one to two feet in front of the end of the floor runner closest to the service counter was a floor advertising mat called a "FloorWindo" (the "FloorWindo"). The Court will discuss the FloorWindo below in more detail.

2

When Farmer reached the front of the customer line after having waited for about ten minutes, she was watching the employees at the service counter and did not notice the FloorWindo. Post office employee Doreen Ellingwood, who recognized Farmer as a regular customer, called Farmer to the service counter at what the parties have called "station three," which was the station situated directly in front of the head of the line. While holding the handle of her cart in her right hand, Farmer took one step with her left foot, felt her foot "catch on something," and then fell sharply forward onto the floor without being able to brace herself.

Two witnesses saw Farmer fall. The first was Ellingwood, who was the only post office employee to see the fall and who first observed Farmer when she called her to the counter. Ellingwood was unable to see Farmer's legs and feet because of the service counter. A customer, Tina Monday ("Tina"), also saw Farmer fall. Tina and her husband, Scott Monday ("Scott"), were standing at the service counter at what the parties have called "station two," which was next to station three a few feet away. Tina was standing next to Scott with her elbow on the counter, facing out toward the lobby, waiting for Scott to finish his transaction. She had a clear view of Farmer at the front of the line. Tina was also able to see the FloorWindo mat, which was lying flat. When Farmer was called to the service counter, Tina saw Farmer take one or two steps and then fall. Scott heard the fall, but did not see it. Farmer fell so suddenly that her cart did not roll forward at all; she pulled the cart down with her as she fell.

After Farmer fell, the Mondays rushed to her side and knelt to assist her. Farmer was lying facedown and crying and groaning in pain. Scott helped her roll onto her left side. Tina got up to call 911 and had to walk away, toward the post office entrance, in order to get adequate cell phone reception. Tina did not look at the FloorWindo after Farmer fell, but Scott did, and he testified that he saw a small "crinkle," as if the mat were "bunched up" or "scrunched" in the middle. Farmer

3

testified that as she lay on her side and within minutes of her fall, she was able to observe that the FloorWindo's left front corner, the corner with the tab, was "curled under."

In the meantime, Ellingwood had left the service counter to tell her supervisor what had happened. Ellingwood then returned to the lobby within a few minutes with her supervisor and Annette Crain, the post office's Customer Service Supervisor. Shortly thereafter, paramedics arrived at the post office and gave Farmer medical attention. Crain spoke to Farmer, inspected the area, and took ten photographs, which are contained in Joint Exhibit 1.[2] The photographs depict, variously, the FloorWindo as it appeared at that time as well as Farmer lying on the floor on her left side, being attended to by Scott Farmer and the paramedics, and lying on the paramedics' gurney. After the paramedics placed Farmer onto the gurney, they took her to Edward Hospital's Plainfield facility (the "hospital").

**Plaintiff's Injuries**

As a result of the fall, Farmer suffered injuries to her left wrist, left hand, head, chest wall, ribs, right knee, and right shoulder. Her pain level immediately after the fall was a ten out of ten. Farmer was treated at the hospital, released that day, and given narcotic pain medication. She is allergic to narcotics, however, so she suffered an allergic reaction. To control her pain thereafter, she was able to take only extra-strength over-the-counter pain relievers.

Two days later, Farmer returned to the hospital because she was still in a great deal of pain. The doctor on duty found no fractures and instructed Farmer to follow up with her primary-care doctor, which Farmer did six days later. In February 2012, Farmer sought treatment with an

---

[2]There are eleven photographs contained in Joint Exhibit 1, but a photograph of the paramedics attending to Farmer lying on a gurney appears to be a duplicate, so there are really ten discrete photographs.

orthopedic surgeon because the level of pain in her right shoulder was still a ten out of ten. The surgeon recommended an MRI, which showed tears in the tendons in Farmer's right shoulder. In February, March, and April 2012, Farmer pursued a physical therapy regimen, which provided only temporary pain relief immediately after a session. In April 2012, plaintiff began working as a registered nurse at Linden Oaks Hospital. She drove herself to work and did not require assistance with her job duties. Farmer worked there for three months.

In June 2012, Farmer saw Dr. Brian Forsythe, an orthopedic surgeon at Rush University Medical Center. Dr. Forsythe concluded that although Farmer was not a candidate for traditional rotator-cuff repair, she was a candidate for "reverse total shoulder replacement," a surgical procedure that involves reversing the mechanics of the shoulder by replacing it with a prosthetic ball attached to the shoulder bone and a prosthetic socket attached to the upper arm bone. On August 9, 2012, Dr. Forsythe performed reverse total-shoulder replacement and biceps tendon repair surgery on plaintiff. After the surgery, Farmer wore a large sling to brace her shoulder and arm. She still felt pain at a level of eight or nine, but post-operative physical therapy provided some relief. Through the fall and winter following surgery, plaintiff's physical limitations prevented her from fully enjoying and participating in holiday and family celebrations. Her daily routine was also affected; she needed assistance with a lot of activities, including getting dressed and going grocery shopping. To this day, Farmer still has pain and still requires assistance with various daily activities. Her shoulder rotation is limited, and she has scarring from the surgery.

The parties have stipulated as follows: the surgery Dr. Forsythe performed on Farmer's right shoulder was necessitated by the injuries Farmer suffered at the post office; Farmer's pre-operative and post-operative physical therapy sessions were necessitated by her injuries resulting from the post office fall; Farmer's medical treatment listed in Plaintiff's Exhibit 8, including the surgery, is related

to the fall at the post office; as a result of the fall and injuries, Farmer's medical expenses total $163,660.15; and plaintiff's recovery, if any, is limited to $975,000.00. The parties have also stipulated that as a result of the fall, Farmer now has a permanent lifting restriction of ten pounds.

**The FloorWindo**

The FloorWindo is a rectangular mat, about two feet wide by three feet long. It has a clear plastic top layer with rubber edges and a bottom rubberized base layer. The rubber edges of the FloorWindo are beveled toward the floor. The bottom of the FloorWindo has an anti-skid rubber tread pattern designed to grip the floor surface. Advertising posters can be inserted between the clear plastic top layer and the base by using a tab to lift the clear layer and insert the poster between the top and the base. The tab is constructed of the same material as the edges and located on the side of the FloorWindo near one of the corners. The parties do not dispute that a new, or used but undamaged, FloorWindo that lies flat is a safe product to walk on.

An undamaged FloorWindo has a locking mechanism on the bottom at the corner closest to the tab, where the layers of the mat can be separated. The locking mechanism is essentially a short strip that is connected to the edge material and holds the layers together. The FloorWindo that was on the post office floor at the time of Farmer's fall, Joint Exhibit 4, is damaged and no longer has a locking mechanism, and it is not clear when the mechanism became detached. (As discussed below, it is plaintiff's expert's position that it was missing at the time of the fall.) The FloorWindo is also damaged in other ways. The rubber edges have become entirely detached from the plastic top layer on the tabbed corner of the FloorWindo, on that entire side of the mat and adjacent corner, so that the top plastic layer curls upward. The edges are partially detached in other areas. The

plastic top layer is cracked in several places near the tabbed corner.[3]  The FloorWindo is also slightly buckled and does not lie entirely flat at the tabbed corner or at the other corner on the shorter side of the FloorWindo.  Several parts of the treads on the bottom side of the FloorWindo have separated from the bottom layer, and one or two treads are missing entirely.  The parties offer differing explanations for the current condition of the FloorWindo, as discussed below.

The poster in the FloorWindo now and at the time of Farmer's fall is a holiday advertisement with a mostly red background and the word "cheer" printed on it in large script.  The advertisement also bears the messages "SHIP THE SELF-SERVICE WAY THIS HOLIDAY" and "AVAILABLE HERE" and depicts several USPS Priority Mail parcels.

When Crain inspected the area where Farmer had fallen a few minutes after the fall, she did not see anything on the floor that was out of the ordinary.  She did not see debris, wetness, or any tripping hazard.  When Crain looked at the FloorWindo, she saw that it was lying flat on the floor, without curling or damage.  Prior to Farmer's fall, she had never observed any damage to, cracks, or curls in the FloorWindo or that it was not lying flat.  Crain spoke with Ellingwood about the fall and had the FloorWindo removed from the lobby that day and brought to her office so that she could further inspect it.  She inspected it in her office that day by hand, by looking it at, feeling the edges, turning it over, and looking at the front and back.  She did not see anything wrong with the FloorWindo.

Crain supervises the post office's custodians, who clean the post office and put retail displays in place.  In December 2011, Ronald Schwichtenberg was the custodian who was responsible for

_____

[3]Moreover, when the FloorWindo was transported from the courtroom to chambers for storage after the trial, a piece of the plastic top layer in the cracked area broke off.  The parties agree that the condition of the FloorWindo noticeably deteriorated even over the few months prior to trial.

cleaning, inspecting, and placing the FloorWindo on the post office floor and exchanging or flipping its advertising inserts. Maintenance personnel at the post office sweep and mop the lobby floor every morning. Schwichtenberg mopped the floor first thing in the morning, prior to opening, with a solution of water and soap floor cleaner. He used a fan to dry the floor so that it would be dry by the time customers arrived at opening time. Schwichtenberg mopped over the FloorWindo daily, and about weekly he lifted and slid it over to mop the floor underneath. About once a month, Schwichtenberg lifted the entire mat to look at it or change the insert; at this time, he would check for any damage. He never found any damage to the FloorWindo prior to Farmer's fall and had never received any complaints about it. If he had noticed that the FloorWindo was damaged, he would have removed it from service.

Schwichtenberg was not in the lobby when Farmer fell or immediately thereafter. He was instructed to bring the FloorWindo into Crain's office and did so after the paramedics left. When Schwichtenberg brought the FloorWindo to Crain's office, he inspected the mat with Crain by kneeling down to look at it, checking for damage and whether it would slide on the floor. He found no defects. The FloorWindo lay flat on the floor.

Schwichtenberg testified that the FloorWindo was in use at the post office when he moved from letter carrier to custodian in 2007 or 2008. He did not know how long it had been in use prior to his job change. He could recall having exchanged the advertising inserts at least twelve times. Generally, the USPS retail department provided instructions on where to place the FloorWindo, but Schwichtenberg was ultimately responsible for its placement. He typically positioned the FloorWindo either at the front of the line where customers would wait or at their point of egress from the service counter. When he placed the FloorWindo at the front of the line, his usual practice was to position it about a foot to a foot and a half in front of the end of the floor runner and so that

8

the edges of the FloorWindo were parallel to the floor tile's grout lines. The FloorWindo as it

appears in the photographs taken by Crain is skewed in a clockwise direction from Schwichtenberg's

usual placement of the mat.[4]

At some point after Farmer's fall, Crain instructed Ellingwood to package up the FloorWindo

in case the USPS safety unit in Bedford Park, Illinois were to request it. Ellingwood testified that

she obtained one of the boxes an outside vendor used to ship retail supplies to the post office. The

box had an opening that measured about six inches by six inches. Ellingwood rolled up the

FloorWindo tightly from the short edge, with the clear plastic layer on the inside, and put it in the

box. Ellingwood was able to see the top and bottom of the FloorWindo when she boxed it up; it was

in good condition with no damage. She did not see any cracks in the top layer, and the treads on the

bottom were intact. After Ellingwood packaged the FloorWindo, the box remained in Crain's office

for more than a year before it was sent to another USPS facility.

Plaintiff presented the expert testimony of Russell Kendzior, who since 1990 has worked

exclusively in the field of floor safety and trip-and-fall prevention. He is the president of a

consulting firm called Traction Experts. Among other work in the field, Kendzior has developed

slip-and-fall prevention products, established national safety standards, presented safety seminars,

and consulted with large retailers. Kendzior is familiar with the FloorWindo product by having

tested its top layer for slip resistance for the National Floor Safety Institute (the "NFSI"), an

---

[4]It is possible that the force of Farmer's fall moved the FloorWindo a short distance across the floor, scooting the front left corner forward. It is also possible, but less likely, that someone moved the FloorWindo shortly after the fall. (No one testified that he or she saw anyone doing so.) Schwichtenberg testified that his practice was to place the mat oriented in such a way that its shorter edges were parallel to the grout lines of the post office's floor tiles, which is different from how the FloorWindo is lying in the photographs in Joint Exhibit 1.

organization he founded and for which he volunteers.[5]   It is Kendzior's opinion that prior to

Farmer's fall, the FloorWindo was not a safe walking surface because it was past its "life

expectancy," was cracked and "elevated" at the tabbed corner, had a missing locking mechanism,

and had damaged bottom treads.   Kendzior was unable to estimate the life expectancy of a

FloorWindo; he stated that it depends on the mat's degree of wear and whether the mat is placed in

a location of high or low foot traffic.   It is also Kendzior's opinion that the damage to the

FloorWindo was not caused by rolling it and putting it in a box.   Kendzior further opined that the

FloorWindo constituted a tripping hazard because it was improperly placed in a high-traffic area and

not the area indicated on the advertising insert, and it was placed with the tabbed corner positioned

in such a way that if the tab or locking mechanism were damaged, a person's toe could get caught

on that corner.   In Kendzior's estimation, Farmer's fall was caused by a damaged and elevated

tabbed corner of the FloorWindo.[6]

The United States presented the expert testimony of Kenneth Newson, who is a floor-

covering consultant and licensed floor-covering contractor in California.   He has worked in the

commercial floor-covering business since 1972 in various capacities, as a salesman, contractor, and

consultant.   Newson has consulted on floor coverings, including floor mats, for entities that include

governmental agencies, hospital systems, and retailers.   He has experience designing and

manufacturing floor mats.   Prior to this case, Newson did not have experience with the FloorWindo

---

[5]The NFSI certified the top layer of the FloorWindo for slip resistance.  The Court mentions this fact for completeness of the narrative and not because it is relevant to the legal analysis; again, there is no dispute that a new, or used but undamaged, FloorWindo that lies flat is a safe product to walk on.

[6]Kendzior testified that he did not believe that the fall was caused by any "delamination" of the treads on the underside of the FloorWindo.

product, but had worked with office chair pads, which in his view are similar to the top layer of the FloorWindo. It is Newson's opinion that at the time of Farmer's fall, the FloorWindo was not defective or damaged, and that it was later damaged and permanently deformed as a result of being rolled and placed in a box. Newson testified that the FloorWindo need not have been placed outside a high-traffic area in order to have been used safely. He also opines that Farmer's fall was not caused by a defective FloorWindo.

## CONCLUSIONS OF LAW AND APPLICATION OF FACTS TO LAW

The Court has subject-matter jurisdiction over this case under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671-2680 (the "FTCA"). Pursuant to the FTCA, the substantive law of Illinois, the state where the alleged tort occurred, applies. *Gipson v. United States*, 631 F.3d 450-51 (7th Cir. 2011).

In order to prevail on a premises liability claim, a plaintiff must prove that (1) a condition on the property presented an unreasonable risk of harm to people on the property; (2) the defendant knew, or in the exercise of ordinary care should have known, of both the condition and the risk of harm; (3) the defendant could reasonably expect that people on the property would fail to discover or recognize the danger or would otherwise fail to protect themselves against it; (4) the defendant was negligent in one or more ways (for example, by failing to remedy or warn of the risk or failing to exercise reasonable care to protect people against the danger); (5) the plaintiff was injured; and (6) the defendant's negligence was a proximate cause of the plaintiff's injury. *Hope v. Hope*, 924 N.E.2d 581, 584 (Ill. App. Ct. 2010) (citing *Simich v. Edgewater Beach Apartments Corp.*, 857 N.E.2d 934, 945 (Ill. App. Ct. 2006)); *Galbreath v. Wal-Mart Stores, Inc.*, No. 10-2065, 2011 WL 1560669, at *3 (C.D. Ill. Apr. 25, 2011). Absent the landowner's actual or constructive knowledge of dangerous or defective conditions on the premises, there is no premises liability. *Caburnay v.*

11

*Norwegian Am. Hosp.*, 963 N.E.2d 1021, 1031 (Ill. App. Ct. 2011).

A plaintiff does not have to prove actual or constructive notice when she can show that the dangerous condition was placed on the premises through the defendant's negligence. *Id.*; *Reed v. Wal-Mart Stores, Inc.*, 700 N.E.2d 212, 214 (Ill. App. Ct. 1998). In order to prevail on a negligence claim, a plaintiff must prove the existence of a duty on the part of defendant, a breach of that duty, and injury that was proximately caused by that breach. *Caburnay*, 963 N.E.2d at 1031.

As to her claim for premises liability, plaintiff contends that defendant was on constructive notice that the FloorWindo was in a defective or dangerous worn condition due to its missing treads, missing locking mechanism, and cracked top layer and edge. Plaintiff cites the same defects in support of her argument that the defendant negligently allowed the FloorWindo to remain in use at the post office. But she failed to prove that the FloorWindo had any of these defects prior to her fall.

Farmer did not look at or notice the FloorWindo prior to her fall. Tina Monday testified that she saw the FloorWindo prior to Farmer's fall and that it was lying flat. The Court found this testimony to be credible. Annette Crain testified that the condition of the FloorWindo when she inspected it on December 20, 2011 was nothing like its current condition; the mat was not cracked, bent, or damaged in any way. The FloorWindo's edges as well as the treads on the bottom layer were intact. Ronald Schwichtenberg similarly testified that he inspected the mat closely that day and found no damage whatsoever. (He did concede, though, that he could not recall whether the locking mechanism had been missing.) Doreen Ellingwood testified that when she boxed up the FloorWindo at some point after Farmer's fall, she saw no damage to the mat. Moreover, none of them had ever received any previous complaints about the FloorWindo, and plaintiff presented no evidence that anyone at the post office had previously received a complaint about it. Schwichtenberg had occasion to look at the FloorWindo every day when he was cleaning the lobby,

and more closely when he changed the advertising insert, and he stated that if he had noticed any

defects in the FloorWindo, he would have removed it from use. It takes no special training to

discern defects in or damage to a FloorWindo, and if the FloorWindo had been damaged,

Schwichtenberg would have had no reason to continue using it in the post office lobby. The Court

found the testimony of Crain, Schwichtenberg, and Ellingwood to be wholly credible.[7] All of them

remembered certain details about the incident and/or what happened afterward, but when they did

not remember or had not noticed something, they readily admitted it. The Court saw no sign that

they embellished or exaggerated their memories of the events. These witnesses' recollections of the

FloorWindo's condition on the day of Farmer's fall are reliable and persuasive. Furthermore, the

photographs taken by Crain minutes after Farmer's fall show a completely flat, undamaged

FloorWindo with no defects.

Farmer's assertion that she noticed that the left corner of the FloorWindo was "curled" after

---

[7]Plaintiff assailed Schwichtenberg's credibility by pointing out that Schwichtenberg testified at trial that he did not recall if he had rolled up the FloorWindo and put it in a box, but at his deposition, he had stated that "we" rolled up the FloorWindo "and put it in a box." At trial, Schwichtenberg explained that he could not remember if he had simply tried to roll up the FloorWindo or had stored it somewhere for a period of time without having packaged it. Schwichtenberg's testimony at trial does not call his credibility into question, nor does it raise much doubt about who actually packaged the mat. Crain testified clearly that she instructed Ellingwood to box up the FloorWindo. Ellingwood clearly recalled that she herself boxed up the FloorWindo and exactly how she did it. Schwichtenberg's deposition testimony regarding the circumstances of the packaging of the mat, on the other hand, was hazy even at his deposition, and at trial he appeared to be genuinely perplexed that he could not remember the exact circumstances of the FloorWindo's packaging. The Court finds it likely that Schwichtenberg was either present when Ellingwood rolled and boxed the FloorWindo or that they had discussed it at the time, such that years later (and after his retirement from USPS employment), Schwichtenberg was confused on that point. In the Court's view, Schwichtenberg's confusion does not cast doubt on his veracity. The Court finds that Ellingwood packaged the FloorWindo in the way she described.

her fall is unsubstantiated, and the Court found that plaintiff was not credible on this point.[8]

Although Scott Monday testified that after the fall, he saw a "crinkle" in the FloorWindo or that it was "bunched" or "scrunched," he did not say that it was on the corner of the mat. He testified that the "scrunching" was in the middle of the mat, toward its left side. On cross-examination, Scott conceded that he could not explain how the FloorWindo could "crumple," considering its texture. It is likely that he was simply mistaken. Given that the photographs Crain took minutes after Farmer's fall depict an undamaged FloorWindo and that the FloorWindo is relatively heavy, inflexible, and resistant to maintaining any sustained curl or bend when undamaged,[9] the Court is unable to find that the FloorWindo was "curled" or had a "crinkle" after the fall. And in any event, even if the FloorWindo had a "curl" or "crinkle" after the fall, plaintiff submitted no evidence that it was not lying flat *prior to* the fall. Tina Monday testified that the FloorWindo was lying flat then. Farmer did not see the FloorWindo prior to her fall. Not a single witness said that they saw any problem with the mat before the fall. Scott Monday testified that he had not seen a "crumple" in the FloorWindo before Farmer fell.

As to the purportedly defective condition of the FloorWindo prior to her fall, plaintiff relies on her expert, Russell Kendzior, who opined at trial that Plaintiff's Exhibit 11, which is a PNG file of Photo 1163 that features a greater zoom on the tabbed corner of the FloorWindo, clearly shows that the corner is open and raised and has a crescent-shaped crack with a raised edge. The Court

---

[8]There were indications that some details of plaintiff's version of the events have changed over time. For instance, on cross-examination, plaintiff admitted that she had previously stated that the mat she tripped on was primarily black, and explained that from floor level, the FloorWindo had appeared to be primarily black. That explanation is not credible. Even from floor level, the FloorWindo would have appeared to be primarily red. (The floor *runner*, however, was black.)

[9]In addition, the Court found persuasive Newson's testimony that the FloorWindo is stable, meaning that it will return to its original shape after a force has been applied to it.

14

disagrees with Kendzior's assessment. In Plaintiff's Exhibit 11, one can discern a short, faint, white mark, perhaps one to two inches long, near the tabbed corner of the FloorWindo. The mark does not appear to be the result of glare from any light source, as the government suggested, and it seems to correspond with one of the present-day cracks in the FloorWindo. That said, the photograph might depict a crack, but it seems equally possible that it depicts merely a scratch or scuff mark. Ultimately, however, neither this photograph nor the other JPEG photos from 2011 upon which plaintiff relies show a cracked edge or broken and "elevated" tabbed corner, or anything that plaintiff could have caught her foot on, as Kendzior claimed.

Kendzior did not examine the FloorWindo until months after he wrote his report, and the government produced digital JPG versions of Crain's photographs only shortly before trial at plaintiff's request. Kendzior's report, therefore, was based on hard-copy photographs only, those taken by Crain in 2011 as well as a number of photographs of the FloorWindo taken in 2014 that show it in a much worse condition than in 2011. The Court therefore finds dubious the conclusion in Kendzior's report that that the FloorWindo "clearly shows multiple defects including a cracked edge, a broken and elevated left corner and delaminated backing material," (Pl.'s Ex. 1), as well as the very specific conclusion that the tabbed corner of the FloorWindo was raised one-quarter inch to one-half inch and thus posed a tripping hazard under floor industry standards. At the time Kendzior prepared his report, he was unable to zoom in on or enhance the resolution of any areas of the photographs that depict the FloorWindo as it appeared in 2011. The Court had the impression that Kendzior used the zoomed photograph at trial simply to confirm his prior conclusions, which were unsupported by evidence, that the FloorWindo had been damaged on the day of the fall. The

Court was not persuaded by Kendzior's conclusions.[10]

The reference in Kendzior's report to the FloorWindo's backing material could only have been based on the photographs of the mat that were taken in 2014, which have little relevance to the condition of the mat on December 20, 2011. There are no photographs from the day of Farmer's fall that depict the underside of the FloorWindo. Plaintiff suggested that this omission was suspicious, but the Court finds it likely that there are no photographs of the underside because there was no damage to the underside and nothing in Crain's view that was worth photographing. With respect to the missing locking mechanism, Kendzior opined that it had been damaged for a long time but conceded that he was unable to conclude whether it was missing on the day of Farmer's fall. Kendzior's determination that the damage to the mechanism was the result of foot traffic and not from rolling it in a box for storage was pure conjecture. The Court also notes that because of the FloorWindo's weight, it is possible for an otherwise undamaged FloorWindo to lie flat even if it is missing a locking mechanism.

As to the treads, the Court did not find persuasive Kendzior's opinion that the rolling of the FloorWindo could not have caused the treads to separate from the back layer of the mat. Kendzior explained in a conclusory fashion that the treads were damaged "in service" and that they would have separated from the underside of the FloorWindo only from excessive loading, meaning being stretched as a result of pedestrian traffic over the mat for a long period of time. It seems just as likely, however, that the combined effects of rolling and storage in a box for an extended period of

---

[10]Kendzior also made the unfounded assumption that the only reason the FloorWindo was removed from service after Farmer's fall was that it must have been damaged. Crain, however, testified that she had the FloorWindo removed from the lobby not because she considered it to be unsafe but because she wanted to inspect it. She then had it boxed to send to the USPS safety unit upon request.

time could produce the same result. The Court was also unpersuaded by Kendzior's suggestion that

the soil on the underside of the FloorWindo corresponds to the grout lines in the floor tile of the post

office and demonstrates that the floor "embedded" itself in the underside of the FloorWindo.

Schwichtenberg did not testify that he always placed the FloorWindo in the same place along the

same grout lines; rather, he testified merely that it was his practice to place the mat's edges parallel

to grout lines.

The Court is unable to agree with Kendzior that the FloorWindo was past its "life

expectancy," or so worn as to be unsafe. Although it can be inferred from Schwichtenberg's

testimony that the FloorWindo had been in service at the post office for at least three years prior to

Farmer's fall, and possibly longer, there is no evidence that it was damaged or "worn out." As

discussed above, the evidence is to the contrary.

The Court agrees with the government that Kendzior's testimony amounts to little more than

an unsupported conclusion that the FloorWindo must have been defective because Farmer fell after

having come in contact with it. Kendzior's conclusions are also at odds with the testimony of Crain,

Schwichtenberg, and Ellingwood, who actually examined the FloorWindo in 2011. Plaintiff failed

to meet her burden of proof that the FloorWindo was damaged, defective, or improperly maintained

prior to her fall such that it created an unreasonable risk of harm to customers like her. The evidence

indicates that the current damaged condition of the FloorWindo is attributable to the manner in

which it was stored during the years prior to trial.

Plaintiff also contends that the FloorWindo was negligently placed for three reasons: (1) it

was in an area of "heavy traffic"; (2) it was placed with the tabbed corner and "opening edge"

toward the line of customers; and (3) the statement in the lower corner of the FloorWindo insert that

it was a "Self-Service Queue FloorWindo Insert" was "ignored." Plaintiff failed, however, to

introduce any evidence that any of these circumstances created an unsafe condition. There was no

evidence supporting Kendzior's view that the FloorWindo is designed to be used in a low-traffic

area or with the tabbed corner facing away from the direction in which most pedestrian traffic

approaches. Kendzior conceded that there are no safety instructions, or even recommendations,

from the FloorWindo manufacturer (or anyone else) that the mat should be placed with the tabbed

corner away from pedestrians' path of travel or that the mat can only be safely placed outside of a

high-traffic area. There was no evidence that the FloorWindo at issue had experienced more

pedestrian traffic than was anticipated in normal use or for which it was designed.[11]

As to the insert's "Self-Service Queue" designation, plaintiff failed to show that a dangerous

condition resulted from the placement of an advertisement at the front of the service-counter line

that the USPS retail or marketing department intended to be at another location in the post office,

the self-service kiosk. There is no evidence that the intended location of the advertising insert had

anything to do with safety. Moreover, it cannot be inferred from the intended location of the insert

that the FloorWindo *itself* was unsafe when used in places other than the self-service kiosk.

For the foregoing reasons, the Court concludes that plaintiff has failed to prove by a

preponderance of the evidence that the conditions at the Plainfield post office, in particular the

condition, use, maintenance, and placement of the FloorWindo, presented an unreasonable risk of

harm to persons on the property or that the defendant breached a duty owed to plaintiff. It is

unfortunate that plaintiff fell and suffered injuries when she visited the post office, but she has not

---

[11]In support of his contention that the FloorWindo had seen heavy traffic, Kendzior cited his
impression of the condition of the FloorWindo in 2011, which the Court discussed above and
rejected, as well as the scratches and scuff marks on the FloorWindo. Scratches and scuff marks on
a plastic floor mat are inevitable. The salient question is whether they are indicative of a
FloorWindo that has seen heavier traffic than would be expected. There was no evidence of that.

shown that her injuries were caused by any negligence on the government's part.  The Court will

enter judgment in favor of the United States and against plaintiff on plaintiff's claims for premises

liability and negligence.

## CONCLUSION

Plaintiff failed to meet her burden of proving that the United States is liable for her injuries.

Accordingly, judgment is entered against the plaintiff and in favor of the United States.  Civil case

terminated.


**SO ORDERED.**                                    ENTERED:   October 29, 2015


_____
**JORGE L. ALONSO**
**United States District Judge**